**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION – CINCINNATI**

LISA BRITT,                      :     Case No. 1:17-cv-724

                              :

        Plaintiff,        :     Judge Matthew W. McFarland

                              :

      v.                   :

                              :

HAMILTON COUNTY, *et al.*,     :

                              :

        Defendants.     :

---

## ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT (Docs. 78 & 79)

---

This matter is before the Court on two separate motions for summary judgment—one filed by the "NaphCare Defendants" and the other filed by the "County Defendants." (Docs. 78 & 79.)  The NaphCare Defendants are NaphCare, Inc., Angela M. Moore, RN, BSN, Danielle McFarland, LPN and Allison Kolb, LPN.[1]  The County Defendants, although originally a larger group, now only consists of Sergeant Melissa Kilday.[2]  Both the NaphCare Defendants and Sgt. Kilday contend that they are entitled to summary judgment as to all of Plaintiff's remaining claims.  This matter is fully briefed (*see* Docs. 85, 86, 87, 88, & 90) and thus ripe for review.  For the reasons below, both motions for summary judgment (Docs. 78 & 79) are hereby **GRANTED**.

---

[1] Plaintiff is no longer pursuing claims against Dr. Everson or Dr. Johansen.  (*See* Doc. 86 at 1, n. 1.)  Accordingly, Dr. Everson and Dr. Johansen are dismissed from this case.  The Court also notes that there is no relation between the undersigned district court judge and Nurse Danielle McFarland.

[2] Plaintiff is no longer pursuing claims against Hamilton County or Sheriff Neil.  (*See* Doc. 85 at 1, n. 1.)  Accordingly, Hamilton County and Sheriff Neil are dismissed from this case.

# FACTS

## I. Introduction

In October 2016, Tommy Britt was arrested for a probation violation and booked into the Hamilton County Justice Center (HCJC). As an admitted daily heroin user of seven years, Britt complained of, and was treated for, symptoms consistent with heroin withdrawal. Eight days later, however, his condition deteriorated significantly and he was quickly transferred to University of Cincinnati Hospital (UC). Physicians later diagnosed him with endocarditis—an infection in the lining of his heart caused by his prior intravenous drug use—which had caused him to have a stroke. After spending 20 days in the hospital, Britt passed away. He was only 23 years old.

Plaintiff Lisa Britt is Tommy Britt's mother and the administrator of his estate. In this action, she alleges various claims against certain individuals involved in Britt's medical care during his brief detention at HCJC, as well the entities that employed those individuals.

The story of Tommy Britt is heart-breaking and emblematic of the devastating impact the opioid crisis has had on our nation. The specific question here, however, is whether Britt's estate has marshaled facts, based on admissible evidence, from which a reasonable juror could find the prison employees and individual nurses who interacted with Britt during his brief detention—as well as the private medical contractor that employed those nurses—are liable for his death.

## II. Defendants

***County Defendants.*** Sgt. Melissa Kilday was employed as a correctional

2

supervisor at HCJC. Her sole interaction with Britt occurred on October 31 while working as the shift supervisor over the area where Britt was housed. As discussed in more detail below, when Britt was found unresponsive in his cell, HCJC staff called a medical emergency (referred to internally as a "George-100"). After Britt was assessed by medical staff, Sgt. Kilday—who expressed concerns that he might harm himself—ordered that he be placed into a restraint chair. Thereafter, Sgt. Kilday never interacted with Britt again.

*NaphCare Defendants*. Defendant NaphCare, Inc., a leading national provider of correctional healthcare, was hired by Hamilton County Sheriff's Office (HCSO) to provide medical services at HCJC. Defendants Angela Moore, Danielle McFarland, and Allison Kolb ("NaphCare Nurses") were NaphCare employees who were involved in Britt's medical care during his detention. As discussed in more detail below, each NaphCare Nurse had only limited interactions with Britt. Nurse McFarland twice administered Britt medications on October 29 and 30, and twice performed drug withdrawal assessments on October 30 and 31. Later on October 31, all three NaphCare Nurses responded to Britt's "George-100" medical emergency. This was Nurse Kolb's sole interaction with Britt and Nurse McFarland's last. Nurse Moore then continued to monitor Britt for the two-to-three hours he was in the restraint chair and, thereafter, never interacted with him again.

### III. Britt's Detention at HCJC

Unless otherwise noted, the following facts are undisputed:

*October 26*. Britt was booked into the HCJC for a probation violation. During

the intake process, he disclosed that he had used heroin daily for over seven years and had last used earlier that same day. NaphCare staff conducted a medical screening and recorded that his vitals were: 110/74 (blood pressure), 98 (temperature), and 80 (pulse). No immediate medical concerns or conditions were identified or reported.

*October 27.* The next day, as part of NaphCare's standard policies and procedures, medical staff conducted an initial physical assessment. Britt's vitals were recorded as: 104/68 (BP), 98.5 (temp) and 105 (pulse). Nothing remarkable was noted about his physical state, except that he had a depressed mood. Medical staff assessed that he was alert and had appropriate appearance, behavior, and consciousness. Due to various reasons, including that Britt disclosed he was detoxing from benzodiazepines and alcohol, medical staff referred him for a medical and mental health evaluation. During this evaluation, Britt further disclosed that he had a history of bi-polar disorder, ADHD, and substance abuse, as well as a history of self-harm. Britt did, however, indicate that he was not currently having thoughts about hurting himself. Medical staff decided to provide counseling to Britt on an "as needed" basis. Moreover, because of his reported history of drug abuse, Britt was admitted to detox protocols. His vitals were taken for a second time that day and recorded as: 119/81 (BP), 98 (temp) and 78 (pulse). Britt later complained of a cough and cold symptoms and was provided the following treatment:

> RX Guaifensen 400 mg PO BID PRN x 5 days for productive cough;
> Chlorpheniramine 4 mg PO BID PRN x 3 days for nasal drainage;
> Salt Water Gargles PO TID PRN x 3 days;
> Ibuprofen 400 mg PO BID PRN x 5 day for sore throat.

4

Medical staff educated Britt about the medications and advised him to increase fluid intake, sleep with his head elevated, and wash his hands frequently.

*October 28*. During his second day on detox protocol, Britt's vitals were taken three times. At his first check, the nurse noted that his pulse of 100 was slightly elevated but that all other vitals were normal. On his second and third checks, his vitals were normal. In sum, his vitals that day ranged between 126/76 - 106/71 (BP), 98 – 98.5 (temp), and 100 – 93 (pulse). Additionally, nurses conducted two separate drug withdrawal assessments. During both, Britt exhibited withdrawal symptoms including nausea, vomiting, restlessness, and diarrhea, but his skin was noted to be "pink/moist/warm." To treat his symptoms, he was prescribed medications which were administered twice daily during "med-pass." Britt also reported a sore throat and was given saltwater gargles. During "med-pass," the process used to administer medications to patients, inmates have an opportunity to report any new complaints or submit a sick call slip. Nurses would then either assess the inmate at that time or, if necessary, schedule them to be seen by a doctor. There is no record Britt ever raised any such complaints during the duration of his detention.

*October 29*. The following day, nurses again conducted two separate drug withdrawal assessments. During both, it was noted that Britt was suffering from the same withdrawal symptoms of nausea, vomiting, and diarrhea, but that his symptoms were "mild" and his skin was "pink/moist." At his first check, Britt's vitals were recorded as: 129/73 (BP), 98 (temp) and 108 (pulse). The nurse noted his elevated pulse as "abnormal" and therefore concluded that his vitals were "not within normal limits."

At his second check, his vitals were recorded as: 107/76 (BP), 98.6 (temp), 71 (pulse). He was twice administered medications, once by Nurse McFarland.

*October 30.* The next day, nurses again conducted two separate drug withdrawal assessments. Nurse McFarland performed Britt's first check and recorded his vitals as: 103/70 (BP), 100.9 (temp) and 103 (pulse). Nurse McFarland indicated that there were no abnormal vital signs and that his vitals were "within normal limits." (Doc. 58-1 at p. 55-8.) Plaintiff disputes whether a temperature of 100.9 and a pulse of 103 are, in fact, "within normal limits." Nevertheless, Nurse McFarland further noted that Britt's only symptom of detox at the time was that he was "restless," and concluded that he was no longer exhibiting signs of withdrawal. (*Id.*) At his second check, his vitals were recorded as: 120/82 (BP), 98.5 (temp) and 80 (pulse). The nurse noted that his skin was "pink/moist/warm," his vital signs were normal, and that he was no longer exhibiting any signs of withdrawal. Britt was administered his medications twice during med-pass, and there is no record of any new complaints.

Furthermore, Britt's mother spoke with him over the phone on October 27, 28, 29, and 30. She testified that he seemed "ok" during each call and, based on their conversations, she had "no concerns" he was sick.

*October 31.* The next day, Nurse McFarland performed another withdrawal assessment at 2:59 am. (Doc. 58-1 at p. 49-52.) His vitals were recorded as: 100/64 (BP), 100.9 (temp) and 107 (pulse). Nurse McFarland again indicated that there were no abnormal vital signs, and that Britt's vitals were "within normal limits." (*Id.*) Plaintiff again disputes whether a temperature of 100.9 and a pulse of 103 are, in fact, "within

6

normal limits." Regardless, Nurse McFarland noted that Britt's skin was "dry" and that he was "restless," but indicated that he was not exhibiting signs of withdrawal. (*Id.*)

The parties' accounts of what transpired next vary substantially. But while Plaintiff disputes most of Defendants' relevant factual allegations, there is ample documentation and witness testimony with regards to what occurred later that evening.

Around 7:15 pm, Britt notified on-call officers that he was experiencing "shortness of breath and feelings of passing out". (Doc. 68-1 at p. 87.) When officers responded, they found Britt unresponsive on his cell floor and called in a George-100 medical emergency. (*Id.*) Shortly thereafter, Sgt. Kilday, along with other corrections officers, responded to the call roughly around the same time as medical personnel, which included the three NaphCare Nurses. (Doc. 58-1 at p. 18; Doc. 65 at p. 14.) To determine if he was responsive, Nurse Kolb placed an ammonia inhalant under his nose. (*Id.*; Doc. 60 at p. 13.) Britt then began "pushing away and turning his head," and, according to Nurse Moore, allegedly attempted to bite Nurse Kolb. (Doc. 60 at p. 13.) When asked to stand up, Britt initially fell but was able to catch himself. (Doc. 86-1.) He was then helped to his feet and, at some point thereafter, had his vitals taken, which were recorded as: 120/74 (BP), 105 (pulse), 16 (breaths/minute). (Doc. 58-1 at p. 18, "Medical Emergency Code Report.") Britt's temperature was not recorded. Although his pulse was elevated, Nurse Moore believed that "[m]edically, he was stable at that time." (Doc. 63 at p. 19.) She testified that "he didn't have an altered mental state. He was detoxing, which also can cause an elevated temp., an elevated heart rate. His blood pressure was normal." (*Id.* at p. 18.) Furthermore, Britt appeared to be alert,

7

oriented, and was responding to the nurses. (*Id*. at p. 22.) In fact, Nurse Moore testified that he even told her that he was feeling better. (*Id*. at p. 19.) And even though Britt fell when he was initially asked to stand up, Nurse Moore testified that "there was nothing medically that showed that he would be falling [and] he was even able to catch himself." (*Id*. at p. 22.) Based on her nursing judgment and experience, as well as the aforementioned observations, she determined that there was no medical condition that necessitated emergency care or a call to the doctor at that time. (*Id*. at p. 18-23.)

At some point during this interaction, Sgt. Kilday, with the input and concurrence of the nursing staff, decided that Britt should be placed into a restraint chair. (Doc. 65 at p. 15.) The reasoning behind this decision is heavily contested. Defendants contend that Britt was put into the restraint chair "for his own safety and to prevent him from committing any acts of self-harm." (Doc. 78.) Plaintiff, however, argues that the decision "was punitive, a punishment for 'abusing privileges' because Defendants believed [Britt] was faking his medical emergency." (Doc. 86.)

Britt remained in the restraint chair for some time between two to three hours. (Doc. 63-1 at p. 20; Doc. 58-1 at p. 16.) Nurse Moore recorded his vitals for a second time as: 120/74 (BP), 105 (pulse), 15 (breaths/minute). (Doc. 58-1 at p. 16, "Restraint/Seclusion Observation Log."). Nurse Moore then continued to check on Britt every fifteen minutes for the duration of his time in the restraint chair. (Doc. 86-1; Doc. 63 at p. 20.) She noted that he was no longer angry, yelling, or threatening, and was alert, oriented, responsive, pleasant, and relaxed. (*Id*.) Nurse Moore notified Dr. Johansen by telephone and informed him of the situation. (Doc. 63 at p. 9-10.) Dr.

Johansen approved releasing Britt from the restraining chair and ordered that he be placed on level 1 suicide watch. (*Id*.) Although Plaintiff alleges Nurse Moore attempted to "falsify records," as discussed later, these allegations are unfounded.

While on suicide watch, inmates at the HCJC are monitored by corrections staff every ten minutes. (Doc. 86-1.) The HCSO's Daily Log Report indicates that rounds were completed by the corrections officers throughout Britt's time on suicide watch, from the evening of October 31 to the morning of November 2. (Doc. 65-1 at p. 112-131.)

*November 1*. Around 10:45 am the next morning, NaphCare employee Elaine Kelly conducted a "Daily Suicide Watch" assessment. She noted that Britt was engaged, oriented, passive, and cooperative; that his judgment, speech, and memory were intact; that he engaged easily with clear communication; and that he denied suicidal ideation. Although, while on suicide watch, Britt was monitored every ten minutes by HCSO staff and medically assessed by Ms. Kelly, it appears that his vitals were not taken. (Doc. 63 at p. 9.)

*November 2*. Around 6 am the next morning, officers found Britt standing at his cell door acting lethargic with what appeared to be vomit and urine on the floor. (Doc. 71 at p. 5.) The officers immediately reported his condition to medical staff, who responded right away. Britt did not know where he was and was unable to respond to questions. A nurse observed that his color was abnormal, and his pulse was extremely elevated. She took his vitals, which revealed a pulse of 165. The nurse notified a nurse practitioner who decided that he needed to be sent to the hospital. Britt arrived at UC's emergency room at 7:50 am. Later that day, his condition further deteriorated, and he

9

was placed in the ICU.  Physicians then performed an echocardiogram that raised

concerns for endocarditis—an infection in the lining of the heart, usually a heart valve,

that has long been recognized to be greatly increased among intravenous drug users.

Over the next three weeks, UC healthcare staff diagnosed Britt with endocarditis

and determined that it was caused by his prior intravenous drug use.  The endocarditis

had damaged his heart valves, destroyed his aortic valve, and caused him to have a

stroke.  Although he responded quickly to antibiotics, his pulmonary status never

improved sufficiently to a point where he could tolerate surgery.  He died on

November 22, 2016, after going into multi-system organ failure due to endocarditis.

## IV.    Procedural History

Following Britt's death, Plaintiff sued various HCJC and NaphCare personnel, as

well as Hamilton County and NaphCare.  Although some Defendants have since been

dismissed, all remaining Defendants now move for summary judgment.  The remaining

claims are:  **Count I**—§ 1983 deliberate indifference against the NaphCare Nurses, Sgt.

Kilday, and NaphCare; **Count II**—medical malpractice against the NaphCare Nurses;

**Count III**—negligence against the NaphCare Nurses and NaphCare; and **Count IV**—

wrongful death against the NaphCare Nurses, Sgt. Kilday, and NaphCare.

## LAW

Courts must grant summary judgment if the record "reveals that there is no

genuine issue as to any material fact and the moving party is entitled to a judgment as a

matter of law."  *Laster v. City of Kalamazoo,* 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed.

R. Civ. P. 56(c)).  Once the movant has met its initial burden of showing that no genuine

issue of material fact remains, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To do so, the nonmovant must present "significant probative evidence . . . on which a reasonable jury could return a verdict" in their favor. *Chappell v. City of Cleveland,* 585 F.3d 901, 913 (6th Cir. 2009). The court "must view the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir. 2007). This requirement, however, does not mean that the court must find a factual dispute where record evidence contradicts wholly unsupported allegations. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (*citing Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

## ANALYSIS

The Court will first analyze Plaintiff's § 1983 deliberate indifference claims before proceeding to Plaintiff's state law claims.

### Count I:  § 1983 Deliberate Indifference to Serious Medical Need

"To prevail on a cause of action under § 1983, a plaintiff must prove (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *North v. Cuyahoga Cty.*, 754 F. App'x 380, 384 (6th Cir. 2018) (citations omitted). The second requirement is uncontested here.[3] The constitutional right at issue is a pretrial detainee's right to

_____

[3] It is undisputed that NaphCare and its employees stand in the shoes of Hamilton County for purposes of § 1983. *See Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018) ("The principle is well settled that private medical professionals who provide healthcare services to inmates at a county jail qualify as

11

adequate medical treatment.

A prison official's "deliberate indifference to serious medical needs of prisoners" violates the Cruel and Unusual Punishment Clause of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Historically, the Sixth Circuit has "consistently applied the same 'deliberate indifference' framework to Eighth-Amendment claims brought by prisoners as Fourteenth-Amendment claims brought by pretrial detainees." *Griffith v. Franklin Cty., Kentucky*, 975 F.3d 554, 567 (6th Cir. 2020) (collecting cases). And while § 1983 states that claims may only be exercised against a "person" who deprives an individual of their constitutional rights, the Supreme Court has "interpreted the word 'person' broadly, and certain polities, including municipalities, are considered persons for purposes of § 1983 liability." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (*citing Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)) ("*Monell* claims").

As such, Plaintiff brings her § 1983 claim against certain individuals involved in Britt's medical care (NaphCare Nurses and Sgt. Kilday), as well as against NaphCare itself, under theories of *Monell* liability. Each Defendant now moves for summary judgment. The Court will first discuss the individual liability of the NaphCare Nurses, then Sgt. Kilday, and then discuss whether NaphCare can be found liable.

## I.   Individual Liability – NaphCare Nurses

One of the primary reasons the NaphCare Nurses contend they are entitled to summary judgment is that there is no evidence they subjectively knew Britt was

---

government officials acting under the color of state law for the purposes of § 1983.").

suffering from anything other than heroin withdrawal.  Indeed, as discussed below, all of the symptoms Britt exhibited during their interactions (*e.g.*, increased pulse, temperature, and his response to their "George-100" assessment) were entirely consistent with an individual going through heroin withdrawal.  As such, Plaintiff cannot satisfy the subjective prong traditionally required for deliberate indifference claims.  However, Plaintiff argues that, after the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the subjective prong no longer applies and the proper standard to evaluate Defendants' actions should therefore be a purely objective analysis.  Other circuits are currently split on whether the subjective standard still applies, and the Sixth Circuit has yet to provide an answer.

The Court's analysis will therefore proceed in three parts.  First, the Court will discuss the background of the law governing a pretrial detainee's right to medical care and outline the legal argument Plaintiff raises.  Second, the Court will answer Plaintiff's unresolved legal question and determine what standard should apply.  Third, the Court will analyze the NaphCare Nurses' motion for summary judgment accordingly.

### A.  A Pretrial Detainee's Right to Medical Care

"The Supreme Court has long recognized that the government has a constitutional obligation to provide medical care to those whom it detains." *Griffith*, 975 F.3d at 566 (*citing Estelle*, 429 U.S. at 104).  "The Eighth and Fourteenth Amendments are violated 'when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care,

13

and reasonable safety.'" *Id.* (*citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)). As discussed above, although the "Eighth Amendment's prohibition on cruel and unusual punishment generally provides the basis to assert a § 1983 claim of deliberate indifference to serious medical needs, [] where that claim is asserted on behalf of a pre-trial detainee, the Due Process Clause of the Fourteenth Amendment is the proper starting point." *Id.* (*quoting Winkler*, 893 F.3d at 890).

Nevertheless, the Sixth Circuit has "consistently applied the same 'deliberate indifference' framework to Eighth-Amendment claims brought by prisoners as Fourteenth-Amendment claims brought by pretrial detainees." *Id.* at 567 (collecting cases). For either set of claims, the Sixth Circuit has held that "[d]eliberate indifference requires proof that the inmate had a sufficiently serious medical need and that a municipal actor knew of and disregarded an excessive risk to the inmate's health or safety." *North*, 754 F. App'x at 385 (*citing Winkler*, 893 F.3d at 890–91). This two-part standard thus contains both an objective component—a "sufficiently serious medical need"—and a subjective component—defendant possessed a "sufficiently culpable state of mind" in denying medical care. *Id.*; *see also Griffith*, 975 F.3d at 567.

The objective component "requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the Constitution." *Griffith*, 975 F.3d at 567 (citations omitted). "A medical need is sufficiently serious if it has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *North*, 754 F. App'x at 385 (citation omitted).

14

The subjective component requires the plaintiff to "demonstrate that the defendant possessed a sufficiently culpable state of mind in denying medical care." *Griffith*, 975 F.3d at 568 (citations omitted). The Sixth Circuit's purpose for including this requirement is clear: "[t]he subjective requirement is designed 'to prevent the constitutionalizing of medical malpractice claims.'" *See Winkler v. Madison Cty.*, 893 F.3d 877, 891 (6th Cir. 2018) (*citing Rouster v. County of Saginaw*, 749 F.3d 437, 446-47 (6th Cir. 2014) (*quoting Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)). As such, a "plaintiff need not show that the defendant acted with the very purpose of causing harm but must show something greater than negligence or malpractice." *Id.* The Sixth Circuit has repeatedly held that a misdiagnosis of an ailment does not satisfy this requirement, nor does a plaintiff's mere disagreement with the medical treatment provided. *See Comstock*, 273 F.3d at 693; *see also Vinson v. Michigan Dep't of Corr.*, 788 F. App'x 312, 317 (6th Cir. 2019). Instead, a "plaintiff must show that each defendant acted with a mental state 'equivalent to criminal recklessness.'" *Griffith*, 975 F.3d at 568 (*citing Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (*citing Farmer v. Brennan*, 511 U.S. 834, 839-40 (1994))). "This showing requires proof that each defendant subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk by failing to take reasonable measures to abate it." *Id.* (citations omitted).

The question Plaintiff raises here—whether the subjective component should still apply in a § 1983 deliberate indifference claim brought by a pretrial detainee under the Fourteenth Amendment—has been previously considered by the Supreme Court, at

15

least in part. In *Farmer*, the Supreme Court expressly "reject[ed] petitioner's invitation to adopt an objective test for deliberate indifference" claims brought by prisoners under the Eighth Amendment. 511 U.S. at 837. In reaching this decision, the Supreme Court recognized that "[i]t is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* However, various reasons, most notably relevant Supreme Court precedent, "mandate inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment." *Id.* at 838. The Supreme Court therefore held that, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.*

However, the Supreme Court's more recent decision in *Kingsley* has drawn into question whether the subjective component should still apply. 576 U.S. at 389. In *Kingsley*, the Supreme Court considered "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of force was *objectively* unreasonable." *Id.* at 391-92 (emphasis in original). As the Supreme Court noted, the subjective standard is closely linked to the language of the Eighth Amendment, which prohibits the infliction of "cruel and unusual punishments," with the focus being "punishments." *Id.* But, unlike convicted prisoners, pretrial detainees cannot be punished at all—they have not been convicted of anything and are still entitled to the constitutional presumption of innocence. *Id.* at 400. The Supreme Court reasoned that

16

pretrial detainees should therefore receive greater protection against excessive force than convicted criminals since the government lacks the same legitimate penological interest in punishing those not yet convicted of a crime. *Id*. at 398-99. The Supreme Court thus held that a pretrial detainee may prevail on an excessive force claim "by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id*. at 398. In other words, a pretrial detainee alleging excessive force "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id*. at 389.

*Kingsley* was a narrow opinion about excessive force claims that did not answer the broader question of whether its purely objective standard applies to all § 1983 claims brought under the Fourteenth Amendment.[4] And circuits are now split on whether an objective test similarly governs inadequate medical treatment claims brought by pretrial detainees under the Fourteenth Amendment. The Ninth Circuit was the first to apply *Kingsley* more broadly, *see Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1070-71 (9th Cir. 2016) (*en banc*), and has since applied it to a medical-need claim brought by a pretrial detainee. *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018). The Second and Seventh Circuits followed suit. *See Bruno v. City of Schenectady*, 727 Fed.Appx. 717, 720 (2d Cir. 2018); *Miranda v. Cty. of Lake*, 900 F.3d 335, 351 (7th Cir.

---

[4] *See id*. at 402 ("We acknowledge that our view that an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment may raise [additional] questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners. We are not confronted with such a claim, however, so we need not address that issue today.").

2018). The Fifth, Eighth, Tenth, and Eleventh Circuits, on the other hand, have chosen to confine *Kingsley* to its facts—that is, to Fourteenth Amendment claims based on excessive-force allegations in a pretrial setting. *See Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017) (noting that "the Fifth Circuit has continued to . . . apply a subjective standard post-*Kingsley*"); *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) (holding that "*Kingsley* does not control because it was an excessive force case, not a deliberate indifference case"); *Strain v. Regalado*, 977 F.3d 984, 991 (10th Cir. 2020) ("We decline to extend *Kingsley* to Fourteenth Amendment deliberate indifference claims for several reasons."); *Dang ex rel. Dang v. Sheriff, Seminole Cty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (declining to apply *Kingsley* to a deliberate indifference claim because "*Kingsley* involved an excessive-force claim, not a claim of inadequate medical treatment due to deliberate indifference," and thus "does not actually abrogate or directly conflict with our prior precedent.") (cleaned up).

Meanwhile, the Sixth Circuit has "generally stayed out of the fray," and recently noted that it has "found it unnecessary to answer the question each time we have confronted the issue, instead holding that the same result would obtain under either the subjective test dictated by *Farmer* or by a purely objective test derived from *Kingsley*." *Griffith*, 975 F.3d at 570 (leaving the *Kingsley* question for another day because plaintiff could not prevail under either standard); *see also, e.g., Martin v. Warren County*, 799 F. App'x 329, 338 n.4 (6th Cir. 2020) (same); *Richmond v. Huq*, 885 F.3d 928, 938 n.3 (not addressing argument because it was not raised); *Troutman*, 979 F.3d at 483 ("This case does not present the opportunity to do so, though the question remains open whether

*Kingsley* applies beyond excessive-force claims.").

Yet here, the outcome would be different depending on which test is applied. If analyzed under the traditional two-prong subjective test, the NaphCare Nurses would be entitled to summary judgment since there is no evidence indicating they subjectively knew Britt was suffering from anything other than heroin withdrawal. But if analyzed under *Kingsley*'s solely objective test, Plaintiff has presented sufficient evidence to raise at least one genuine dispute of material fact that would allow her to escape summary judgment: a juror *could* find that a reasonable nurse in their position *should* have concluded that Britt was suffering from an infection or endocarditis.

Since the present motion thus hinges on a question the Sixth Circuit has yet to answer, this Court must determine, to the best of its ability, which course the Sixth Circuit will take based on existing precedent.

**B.  The Two-Prong Subjective Test Applies to a Pretrial Detainee's § 1983 Deliberate Indifference Claim**

In answering this question, the Court finds the Tenth Circuit's decision in *Strain* most compelling. 977 F.3d 984. Based on facts closely analogous to those of this case, the Tenth Circuit was asked to decide the same question: whether the purely objective standard from *Kingsley* applied to a pretrial detainee's deliberate indifference claim. *Id*. at 989. The Tenth Circuit affirmatively said no. *Id*. It held that, even after *Kingsley*, Fourteenth Amendment deliberate indifference claims must include both an objective and subjective component. *Id*. The court's reasoning was three-fold.

First, the Tenth Circuit read the Supreme Court's opinion in *Kingsley* as a narrow

application of an objective standard only for "'excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment'—nothing more, nothing less." *Id*. at 991 (*quoting Kingsley*, 576 U.S. at 402). The Tenth Circuit held that "*Kingsley* turned on considerations unique to excessive force claims: whether the use of force amounted to punishment, not on the status of the detainee." *Id*. As discussed above, in *Kingsley*, it was the Supreme Court's "focus on punishment" that provided the basis for removing the subjective requirement from a pretrial detainee's excessive force claims. *Id* at 992. This makes sense. But *only* in the context of excessive force claims. Those claims require an affirmative act that amounts to "punishment." *Id*. And the necessary punitive intent, *i.e.* "punishment," can be inferred from affirmative acts that are objectively excessive in relationship to a legitimate government objective. *Id*. But those considerations are entirely inapplicable here since "deliberate indifference often stems from inaction," and "the mere failure to act does not raise the same inference [as an affirmative act that amounts to punishment]." *Id*. at 991. The Tenth Circuit therefore held that "the force of *Kinglsey* does not apply to the deliberate indifference context, where the claim generally involves inaction divorced from punishment." *Id*. at 992.

Second, the Tenth Circuit observed that the nature of a deliberate indifference claim infers a subjective component. *Id*. "After all, deliberate means 'intentional,' 'premeditated,' or 'fully considered.'" *Id*. (*citing* BLACK'S LAW DICTIONARY 539 (11th ed. 2019)). "And as an adjective, 'deliberate' modifies the noun 'indifference.'" *Id*. (*citing* CHICAGO MANUAL OF STYLE § 5.79 (16th ed. 2010)). "So a plaintiff must allege that an actor possessed the requisite intent, together with objectively indifferent conduct, to

20

state a claim for *deliberate* indifference." *Id*. (emphasis in original).

Third, the Tenth Circuit found that "principles of *stare decisis* weigh against overruling precedent to extend a Supreme Court holding to a new context or new category of claims." *Id*. at 991. As the Tenth Circuit noted, the Supreme Court was silent as to whether *Kingsley* applies to Fourteenth Amendment claims outside the excessive force context. *Id*. But the Supreme Court expressly rejected a request to adopt a "purely objective test for deliberate indifference" in *Farmer*, 511 U.S. at 839. Moreover, although the Sixth Circuit stated that it has "generally stayed out of the fray," in that very same opinion, the Sixth Circuit also reiterated that it has "adopted the deliberate-indifference test wholesale for purposes of the Fourteenth Amendment." *Griffith*, 975 F.3d at 569. While the Sixth Circuit could change course in the future, it has yet to do so. And until it does, this Court will not contradict the Supreme Court's rejection of a purely objective test in *Farmer*, nor the Sixth Circuit's longstanding precedent.

Accordingly, the Court will analyze Plaintiff's deliberate indifference claim by applying the traditional two-prong objective/subjective test.

**C.  Analysis**

With the applicable standard set, this case is easily determinable under relevant Sixth Circuit precedent. In order to succeed with her § 1983 claim, Plaintiff must demonstrate that (1) Britt had an objectively serious medical need, and (2) the NaphCare Nurses subjectively knew of and disregarded an excessive risk to Britt's health or safety. The NaphCare Nurses argue Plaintiff cannot prove the subjective component since "[t]here is no indication that [they] *actually knew* about a serious

21

medical need of endocarditis and *consciously ignored it*." (Doc. 87 at p. 2) (emphasis in original). They state that, "[i]t is simply undisputed that: (1) Mr. Britt's symptoms were consistent with heroin withdrawal; (2) no NaphCare personnel knew or had reason to know that Mr. Britt was suffering from endocarditis; and (3) Mr. Britt was seen and medically assessed on a daily basis during his incarceration and when his condition suddenly deteriorated, he was sent to the hospital." (*Id.* at p. 4.)

Plaintiff presents two arguments in response. First, she alleges Nurse McFarland, specifically, "had subjective knowledge of Britt's need to be treated for an infection." (Doc. 86 at p. 15.) Second, Plaintiff argues that all three NaphCare Nurses "subjectively knew [Britt] was suffering a medical emergency [on October 31] and responded by punishing him" with the restraint chair. (Doc. 86 at p. 25.) Each argument is discussed in turn below.

### 1. Nurse McFarland –Drug Withdrawal Assessments on Oct. 29-31

Plaintiff first contends that summary judgment is not warranted as to Nurse McFarland, specifically, because she allegedly "had subjective knowledge of [] Britt's need to be treated for an infection." (Doc. 86 at p. 21.) This argument fails for two reasons: (1) the evidence Plaintiff cites in support, most of which is mischaracterized and misleading, does not demonstrate that Nurse McFarland "subjectively knew" Britt was suffering from anything other than heroin withdrawal; and (2) relevant Sixth Circuit case law overwhelmingly supports summary judgment.

### (i) Plaintiff's Argument Lacks Factual Support

As an initial matter, Plaintiff does not point to any direct evidence that Nurse

McFarland knew Britt was suffering from endocarditis. That is because there is none. Instead, Plaintiff relies on circumstantial evidence to argue that, based on Nurse McFarland's training, she *must* have been subjectively aware that Britt's elevated temperature and heart rate indicated a serious medical condition.

Plaintiff's argument can be summarized as follows. On October 30, Nurse McFarland performed a drug withdrawal assessment on Britt. His temperature (100.9) and pulse (103) were elevated, yet she did not report this to a doctor. On October 31, Nurse McFarland again performed a drug withdrawal assessment. Britt's temperature (100.9) and pulse (107) continued to be elevated, yet she still did not report this to a doctor. Plaintiff therefore contends that Nurse McFarland, "knew [Britt's elevated temperature and pulse] indicated an infection and a need for medical intervention, but she chose not to act. That failure to act . . . [was] deliberately indifferent." (Doc. 86 at p. 22.)

It is undisputed that Nurse McFarland observed Britt's slightly elevated temperature and pulse while he was on detox protocols. Plaintiff's argument ultimately fails, however, because none of the evidence that she cites could support a reasonable inference that Nurse McFarland knew—or even could have known—that Britt was suffering from anything other than the ordinary symptoms of heroin withdrawal. Plaintiff attempts to draw such a connection, but her argument is based on mischaracterizations of the evidence in the record.

For example, Plaintiff claims that Nurse McFarland "received training on . . . complications that can arise from withdrawal . . . This included looking for signs of

23

endocarditis." (Doc. 86 at p. 21.) In support, she cites the deposition testimony of Nurses Kolb and Moore, and nurse practitioner (NP) Michael Pegram. Yet neither Nurse Kolb nor Nurse Moore testified that they ever received training regarding complications that could arise from opioid withdrawal or, importantly, that endocarditis is a known complication arising from such withdrawal. Evidentiary support for these assertions is critical because the only medical evidence regarding the cause for Britt's endocarditis is UC medical staff's determination that it was caused by his prior intravenous drug use—not heroin withdrawal. In other words, the inflammation of the lining of Britt's heart was caused by an infection that entered his system through a needle used to inject drugs. It did not arise from the fact that his body had been denied heroin, *i.e.*, because he was suffering from withdrawal.

Moreover, when asked if NaphCare provided training on endocarditis, Nurse Moore responded, "[n]ot that I'm aware of," and when asked if, "in all of your years of schooling, [have you] been trained on what endocarditis is," she responded, "[j]ust from stuff that I've read, nothing further." (Doc. 63 at p. 23.) And while NP Pegram testified that—as a nurse practitioner—he was trained to "look for signs that someone may be suffering from endocarditis," he went through more schooling than LPNs or RNs so that he could assess patients, make diagnoses, and prescribe medicine. (Doc. 61 at p. 4-6.) He further testified that LPNs and RNs—like Nurse McFarland—are not allowed to diagnose. (*Id.*) (*see also* Doc. 63 at p. 19, Nurse Moore: "I can't diagnose.")

Plaintiff also alleges that "McFarland's own testimony shows that she . . . received training to recognize a patient's elevated pulse and temperature as a sign of

infection." (Doc. 86 at p. 23-24.)  This statement is also misleading.  Indeed, Nurse

McFarland admitted that NaphCare provided medical staff with a 60-page "Health

Assessment Training," one bullet point of which stated: "increase[d] pulse and

temperature could be indicative of infection." (Doc. 60-1 at p. 180.)  But apart from one

bullet point buried in a 60-page PowerPoint, there is no other evidence that indicates

Nurse McFarland was trained to diagnose infections, much less diagnose specific

conditions such as endocarditis based on just two data points.  In fact, when asked if she

would know what to look for if someone was suffering from endocarditis, Nurse

McFarland testified, "that's a diagnosis.  I am not a doctor and I can't diagnose.  So I

wouldn't know exactly what to look for." (Doc. 60 at p. 7.) *See also Rouster*, 749 F.3d at

449 (Nurse "did not display deliberate indifference to a known serious medical need"

when she "did not have the training to understand the significance of the symptoms she

observed during her [] assessment.").

Plaintiff concludes with the assertion that "when [Britt]'s vital signs indicated an

infection, [] McFarland knew that indicated more than withdrawal." (Doc. 86 at p. 23-

24.)  This allegation not only lacks evidentiary support, it is plainly contradicted by the

record.  Nurse McFarland testified that she did not feel Mr. Britt's temperature or pulse

were abnormal under the circumstances of a detoxing patient.  (Doc. 60 at p. 8.)  And

while Plaintiff asserts that whether Britt's vitals were normal is a disputed material fact,

the question is not whether his symptoms were objectively abnormal, but whether

Nurse McFarland subjectively perceived them as abnormal.  She testified conclusively

that she did not.  When asked what things she would look for to determine if

withdrawal was getting to a point where the person needed emergency medical attention, Nurse McFarland testified that "there were different factors . . . one of the biggest things would be if they were conscious." (*Id*. p. 6.) When asked "[a]t what point, with vital signs, would there be . . . an issue," Nurse McFarland responded, "[t]here would usually be several." (*Id*.) When asked what she was trained to report as an abnormal temperature, Nurse McFarland stated, "it depends on the situation," before finally concluding that a temperature of "101.0" was the point at which she felt the need to alert a doctor. (*Id*. at p. 8.) And when asked with regards to an abnormal pulse, Nurse McFarland responded "110." (*Id*.) Although NP Michael Pegram testified that nurses were supposed to notify him or Dr. Everson if a patient's pulse was over 100 (Doc. 61 at p. 10), "the failure to follow internal policies, without more, [does not] constitute deliberate indifference." *Winkler*, 893 F.3d at 891.

In short, Plaintiff's assertions regarding Nurse McFarland's subjective state of mind are based on mischaracterizations of the record, if not devoid of evidentiary support. The evidence, including the deposition testimony cited by Plaintiff, demonstrates that, if a nurse observed multiple abnormal vital signs, they were trained to "request additional medical assistance." (Doc. 60 at p. 6-7; Doc. 60-1 at p. 180.) This determination was not contingent on one or two symptoms, but rather on a holistic view of the patient, their symptoms, and their medical history. Based on Nurse McFarland's subjective consideration of these factors, she did not perceive that Britt required emergency medical attention during her brief interactions with him.

26

### (ii) Plaintiff's Argument Fails as a Matter of Law

Second, and equally important, Nurse McFarland is entitled to summary judgment as a matter of law. Even if Nurse McFarland perceived facts from which she could have concluded that Britt was suffering from a potentially lethal condition, there is no evidence that she ever in fact drew that inference or disregarded it. *See Griffith*, 975 F.3d at 568 (deliberate indifference "requires proof that each defendant subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk by failing to take reasonable measures to abate it.").

Plaintiff's argument that Nurse McFarland "subjectively knew" Britt needed "to be treated for an infection," is based almost entirely on the fact that Nurse McFarland twice observed Britt's slightly elevated pulse and temperature. Yet it is undisputed that both of these symptoms are entirely consistent with those of an individual suffering from heroin withdrawal. Under comparable circumstances, the Sixth Circuit has repeatedly held that when a prison's "nursing staff did not know that [an individual] suffered from a serious medical ailment, and they instead interpreted his symptoms as indicating a different condition, for which they provided appropriate treatment, they were not deliberately indifferent to his medical needs." *Rouster*, 749 F.3d at 453. For example, in *Winkler*, medical staff determined that a pretrial detainee was likely suffering from opiate withdrawal and treated his symptoms accordingly. 893 F.3d at 891. He died five days later from an undiagnosed ulcer. *Id.* His mother sued, alleging that medical staff acted with deliberate indifference for various reasons, including

27

misdiagnosing his ulcer, failing to further investigate the cause of his symptoms, failing to monitor, and failing to follow various opiate-withdrawal and abdominal-discomfort protocols. *Id.* The district court granted summary judgment in favor of the medical staff, and the Sixth Circuit affirmed because the pretrial detainee "had self-reported that he was going through opiate withdrawal . . . his symptoms were consistent with [that] diagnosis," and the medical staff "thus had no reason to suspect that [he] was suffering from anything other than opiate withdrawal." *Id.* at 893-4. Likewise, in *Rouster*, an inmate suffered from "several aberrant symptoms," (*e.g.*, hand tremors, disorientation, and was seen drinking out of the toilet in a general population cell), that made it "obvious [even] to a layperson that [he] suffered from some kind of serious illness." 749 F.3d at 442-43, 451. The nurses, however, thought that alcohol abuse might explain [his] bizarre behaviors," and performed an alcohol withdrawal assessment that resulted in a total calculated score of fifteen. *Id.* Ordinarily, an inmate who received a score greater than fifteen would be sent to the hospital for closer monitoring. *Id.* But since his score was just below that point, nurses kept him at the prison and provided him treatment for alcohol withdraw. *Id.* Even though his symptoms thereafter were "clearly getting worse," the "majority of [his] symptoms were entirely consistent with those experienced by patients suffering from alcohol withdrawal." *Id.* at 451-52. The inmate eventually succumbed to sepsis and died because of an undiagnosed perforated duodenal ulcer. *Id.* at 440. Regardless, the district court granted summary judgment in favor of the nurses, and the Sixth Circuit affirmed because the nurses "believed that [he] was suffering from alcohol withdrawal, and [] treated him appropriately for the medical

28

needs that [they] believed he had." *Id.* at 452; *see also, e.g., Griffith*, 975 F.3d 554; *North*, 754 F.App'x 380; *Troutman*, 979 F.3d 472; *Briggs v. Oakland County*, 213 F.App'x 378, 385 (6th Cir. 2007).

Sixth Circuit precedent thus overwhelmingly supports granting summary judgment in favor of Nurse McFarland. By the time Nurse McFarland had her first interaction with Britt, he had already self-reported that he was going through withdrawal. Medical staff had formally diagnosed him and determined that he be admitted to detox protocols. Nurse McFarland's interactions with him during this time were limited: she twice administered him medications and twice performed drug withdrawal assessments. Although she observed that Britt had a slightly evaluated pulse and temperature, it is undisputed that these symptoms are consistent with heroin withdrawal. Moreover, Nurse McFarland testified that she did not feel Mr. Britt's temperature or pulse were abnormal under the circumstances of a detoxing patient. And it is further undisputed that Nurse McFarland provided Britt with adequate medical care to treat his withdrawal. Based on these facts, the Court cannot conclude Nurse McFarland was subjectively aware that Britt was suffering from anything other than heroin withdrawal. Plaintiff has thus failed to present evidence from which a reasonable juror could conclude that Nurse McFarland exhibited deliberate indifference to a known risk to Britt's health.

### 2. Nurses McFarland, Moore, & Kolb – "George-100" on Oct. 31

Plaintiff next argues that the NaphCare Nurses are not entitled to summary judgment because they "subjectively knew [Britt] was suffering a medical emergency

[on October 31] and responded by punishing him" with the restraint chair. (Doc. 86 at

p. 25.) With regards to Britt's George-100 medical emergency on October 31, there are

two critical points in time that need be analyzed. The first is when all three NaphCare

Nurses responded to the George-100. The second is Nurse Moore's assessment of Britt

while he was in the restraint chair.

### (i) NaphCare Nurses' Response to Britt's George-100

Relative to the NaphCare Nurses' initial response to Britt's George-100 medical

emergency, Plaintiff argues that the NaphCare Nurses' "failure to provide treatment for

[Britt]'s symptoms or have him assessed by a physician, and use of the restraint chair

instead, was [an] unreasonable medical response to his medical condition." (Doc. 86 at

p. 30.) However, contrary to Plaintiff's assertion, the undisputed evidence shows that

the NaphCare Nurses provided Britt with at least some level of medical treatment

before ultimately determining he was stable. Plaintiff merely disagrees with the level of

care provided, as well as the determination that Britt posed a threat to himself. But as

the Sixth Circuit "has made clear [], in order to show deliberate indifference, a plaintiff

must allege more than negligence or the misdiagnosis of an ailment." *Winkler*, 893 F.3d

at 891 (internal quotation and citation omitted). Nor does mere disagreement with the

medical treatment provided constitute deliberate indifference. *Vinson*, 788 Fed. Appx.

at 317. Instead, the Sixth Circuit "has found deliberate indifference on the part of

medical staff under comparable circumstances only where medical care is so cursory as

to amount to no treatment at all." *Winkler*, 893 F.3d at 892 (citations omitted). This is

because "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously,

to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Id.* (internal quotation and citation omitted).

As described above, at around 7:15 pm on October 31, officers found Britt unresponsive on his cell floor and called in a "George-100" medical emergency. The NaphCare Nurses responded and began providing medical treatment. When Nurse Kolb used an ammonia inhalant to determine if Britt was responsive, he pushed away and allegedly tried to bite her. After regaining responsiveness, Britt stood up. Although he initially fell, Nurse Moore testified that "there was nothing medically that showed that he would be falling. I mean, he was even able to catch himself." (Doc. 63 at p. 22.) Nurse Moore then took his vitals. Although his pulse was elevated (105), Nurse Moore testified that "he didn't have an altered mental state. He was detoxing, which also can cause an elevated temp., an elevated heart rate. His blood pressure [120/74] was normal." (Doc. 60-1 at p. 8; Doc. 63 at p. 18.) Nurse Moore further testified that Britt appeared to be alert, oriented, and responsive, and that he even told her that he felt better. In other words, Britt's visible illness, complaints, and symptoms (*e.g.*, increased heart rate) were all consistent with those experienced by an individual going through heroin withdrawal. Based on her nursing judgment and experience, as well as all the aforementioned observations, Nurse Moore determined there was no medical condition that necessitated emergency care or a call to the doctor at that time. And while Plaintiff contends that Nurse Moore thought Britt was "faking it," this argument cuts against Plaintiff since it only further demonstrates that Nurse Moore did

31

not have subjective awareness of a more serious medical condition. As discussed in more detail below, Sgt. Kilday then made the decision to put Britt into the restraint chair. Although Sgt. Kilday sought the NaphCare Nurses' input, it was ultimately Sgt. Kilday's decision—not the NaphCare Nurses'. It was at this time that Nurse Kolb and Moore's limited interaction with Britt ended.

Although Plaintiff points out things the NaphCare Nurses should have done differently, "the standard is not whether there is something easy that the [NaphCare Nurses], with the benefit of hindsight, could have done," but rather, the Court "must judge their actions based on the information that was available to them at the time." *Rouster*, 749 F.3d at 453 (internal quotation and citation omitted). With the benefit of hindsight, it is clear that Britt required additional medical attention on the evening of October 31. Viewing the events of that evening under the proper legal standard, however, the evidence does not give rise to any inference that any of the NaphCare Nurses acted with deliberate indifference. When presented with similar circumstances, the Sixth Circuit has held that, "[a]lthough hindsight shows that the more prudent approach would have been for [the NaphCare Nurses] to gather additional information about [Britt]'s apparent withdrawal and to provide more detailed monitoring instructions, '[c]ourts are generally reluctant to second guess the medical judgment of prison officials.'" *Winkler*, 893 F.3d at 892 (*quoting Rouster*, 749 F.3d at 448).

In short, the NaphCare Nurses responded to Britt's medical emergency, assessed his medical condition and provided treatment. Since this was the last time that Nurses McFarland and Kolb interacted with Britt, they are both entitled to summary judgment.

**(ii) Nurse Moore's Assessment of Britt While in the Restraint chair**

The second critical point in time is Nurse Moore's assessment of Britt while he was on the restraint chair. Plaintiff argues that Nurse Moore failed to monitor Britt's vitals, never took his temperature again, failed to escalate his care to a physician, and did not monitor him for stroke symptoms. Nevertheless, it is undisputed that Nurse Moore did provide some care, just not the particular care Plaintiff wishes she had. Particularly instructive here is the Sixth Circuit's decision in *Rouster*, 749 F.3d at 449-50. There, an inmate was exhibiting bizarre behavior, including drinking out of a toilet in the general population cell. *Id.* at 442. A nurse became rightly concerned about the inmate's mental-health and moved him to an observation cell where COs could easily observe him. *Id.* The nurse did not interact with the inmate again during her shift and never notified the on-call physician. *Id.* The inmate subsequently died due to an undiagnosed perforated ulcer. *Id.* The district court granted summary judgment in favor of the nurse and, in affirming, the Sixth Circuit held as follows:

> This last event is perhaps the most concerning: it seems obvious to us that anybody who has started drinking from a toilet is suffering from some kind of serious medical ailment. Indeed, [the nurse] acknowledged that, after the inmates told her that he had been drinking from the toilet, she became concerned that there was a "significant change in [inmate's] mental status." [] However, we cannot conclude that [the nurse] exhibited deliberate indifference to [the inmate]'s medical needs because she responded to her concerns by moving [him] to an observation cell where he could be closely monitored by correctional staff. Perhaps [the nurse] could have and should have done more, including notifying the on-call physician. But she clearly took appropriate steps to protect [the inmate]. She isolated him from the other inmates in a room where he could not be a danger to himself or others and positioned him in a cell where he would be under near-constant supervision. Although she cannot say for certain that she personally checked on him in the remaining four hours of her

shift, she did not deliberately ignore [his] needs by relying on the COs to monitor his health and behavior at regular intervals.

*Id*. at 449.

Likewise, here, it is easy in hindsight to point out additional things Nurse Moore could have done. But when Nurse Moore's actions are judged based on the information available to her at the time, a reasonable juror could not find that she exhibited deliberate indifference to Britt's medical needs. Simply put, there is no evidence Nurse Moore was subjectively aware Britt was suffering from a more serious medical condition than withdrawal or that she chose to ignore his need for treatment. During the two hours Britt was restrained, Nurse Moore checked on him every 15 minutes. She noted that he was alert, oriented, responsive to questions, pleasant, and relaxed. And contrary to Plaintiff's assertion, Nurse Moore escalated his care to a physician. She called Dr. Johansen, notified him of Britt's condition, and then followed orders to place Britt on Level 1 suicide watch.[5] Unlike the nurse in *Rouster*, Nurse Moore did not have any underlying concerns about Britt's health and yet she still checked on him every fifteen minutes and eventually escalated his care.[6]

In sum, no evidence indicates that any of the NaphCare Nurses were subjectively aware that Britt was suffering from a more serious medical condition than heroin

---

[5] Notably, it was Dr. Johansen—not Nurse Moore—who ultimately decided to put Britt on suicide watch. But as discussed above, Plaintiff has already dismissed him from this case. (*Supra* at p. 1.)

[6] Although Plaintiff alleges that Nurse Moore falsified records "to cover up the fact that Defendants were violating HCJC policy by ordering the punitive use of the restraint chair themselves," this argument has no factual basis. *Infra* at p. 37-9 (*see also* Doc. 87 at p. 6.) Nurse Moore testified that she put Dr. Johansen's name down to indicate that he was notified Britt was on the restraint chair, which she did. (Doc. 63 at p.20.) Regardless, this factual dispute is immaterial because, as discussed below, Sgt. Kilday was authorized under HJCJ policy to order the restraint chair without physician approval. *Infra* at p. 37-9.

withdrawal.  Because they provided treatment for the only medical conditions that they were aware of, a reasonable juror could not conclude that any of them were deliberately indifferent to Britt's medical needs.

## II.   Individual Liability – County Defendant Sgt. Kilday

Plaintiff's § 1983 claim against Sgt. Kilday also falters on the subjective prong. Kilday contends she is entitled to summary judgment because Plaintiff fails to present any evidence that she perceived a substantial risk to Britt's health nor intentionally ignored any such risk.

In support, Kilday cites the following facts, all of which are undisputed.  (*See* Doc. 85-1, "Plaintiff's Response to Proposed Undisputed Facts.")  Britt was an admitted daily heroin user of over seven years who also had a history of mental health issues including bipolar disorder, ADHD, and instances of self-harm.  Prior to their first and only interaction, Britt had already self-reported that he was detoxing from heroin, benzodiazepines, and alcohol; medical staff had placed him on withdrawal protocols and were treating his symptoms accordingly.  Kilday's sole interaction with Britt occurred on October 31, 2016.  While working as the corrections supervisor in the area where Britt was housed, Kilday responded to a George-100 medical emergency after Britt was reportedly found unresponsive in his cell.  When medical staff arrived, Kilday moved out of Britt's cell so they could assess his condition.  (*Id.*)  At this point, Kilday testified that she heard Britt say, "I need to go to the hospital . . . I'm hurting . . . I'm going to do whatever it takes to get sent to the hospital."  (Doc. 65 at p. 15.)  Britt's behavior then became erratic as he began flailing his arms and screaming.  (Doc. 85-1.)

Throughout her fifteen years of experience in corrections, Kilday had observed many inmates who were experiencing normal detox symptoms attempt to hurt themselves in an effort to get to the hospital and get pain medications. Among other things, Sgt. Kilday had seen inmates jump from the top tier of the Justice Center, run into walls, and hit their heads against objects. Based on her experiences as a correctional supervisor and her observations of Britt's behavior that day, Kilday testified that she became concerned Britt might take actions to hurt himself, in a personal effort to be taken to the hospital. (Doc. 65 at p. 15) ("I just remember him saying he would do whatever it takes [to get sent to the hospital], which concerned me for his safety.") With the input and concurrence of the NaphCare Nurses, Kilday then made the decision to place Britt in the restraint chair. (Doc. 85-1.) Thereafter, Kilday had no further interactions with Britt. (Doc. 65 at p. 19.)

Based on these undisputed facts, no reasonable juror could conclude that Sgt. Kilday's actions constitute deliberate indifference. During their brief encounter, Britt exhibited behavior and symptoms that were entirely consistent with heroin withdrawal and his self-reported mental health issues. No evidence indicates that Sgt. Kilday was ever subjectively aware of any other more serious medical condition. Nor is there any evidence that Sgt. Kilday was even capable of making such a determination. Furthermore, Sgt. Kilday quickly responded to Britt's medical emergency. She oversaw the NaphCare Nurses' assessment of Britt's medical condition and their ultimate determination that he was stable. She then took actions reasonably necessary to protect Britt from self-harm (*e.g.* ordering the restraint chair). She then transferred Britt to the

36

care of medical personnel and, thereafter, never had another interaction with him. Accordingly, no reasonable juror could find that: (1) Sgt. Kilday had subjective knowledge that Britt was suffering from endocarditis or any other more serious medical condition; nor (2) Sgt. Kilday intentionally failed to act or otherwise disregarded a known risk to Britt's health.

Once again, Plaintiff's response is based on blatant mischaracterizations of the record. She argues that summary judgment is not warranted because, "[i]nstead of having him assessed or sending him for medical treatment, [Sgt. Kilday] punished him for calling for medical aid and faking his medical needs by ordering him strapped in a restraint chair . . . nor [was she even] authorized to restrain him." (Doc. 85 at p. 18.) This argument lacks factual support for three key reasons.

First, Sgt. Kilday did, in fact, have Britt assessed (the NaphCare Nurses ultimately determined he was stable) and did, in fact, send him for further medical treatment (where Nurse Moore checked on him every fifteen minutes and then escalated his care to Dr. Johansen). Plaintiff merely disagrees with the type of treatment provided.

Second, Plaintiff asserts that Sgt. Kilday was not "authorized to restrain [Britt]; only a physician could order a restraint." (Doc. 85 at p. 18.) For this alleged policy, Plaintiff cites Dr. Johansen's deposition testimony. He testified that "technically speaking, a patient [is] not supposed to be put into a [restraint chair] without me saying so." (Doc. 69 at p. 10.) Yet, Dr. Johansen further testified that "[s]ometimes it occurred where I was not involved and found out that they've gone into the chair after the

event," such as when an inmate is "fighting with [an] officer," "threatening [] nurses," or "say [they're] going to hurt [them]self." (*Id*.) Dr. Johansen does not cite any formal policy. And, while he refers to what he considers best practices—that a physician *should* approve patient restraints—he also acknowledges that emergent circumstances sometimes require a patient to be restrained prior to advising a physician.

Setting Dr. Johansen's inconclusive testimony aside, Plaintiff's argument is nevertheless expressly refuted by Hamilton County Sheriff's Office Written Policy and Procedures on Use of Restraints. (Doc. 68-1 at p. 83-86, "Written Policy.") The section of the Written Policy that covers the use of restraint chairs (§ VI) says nothing about "physicians," but rather states that the "[u]se of the restraint chair must be authorized by the Mental Health/Medical Staff *or Security Supervisor*"—such as Sgt. Kilday—"for one of the following reasons: (1) to prevent self-injury, injury to other, or property damage . . ." (*Id.* at p. 85, § VI(A)) (emphasis added.)

Sgt. Kilday's actions were consistent with the Written Policy. She expressed concerns that Britt might harm himself and was likely aware that Britt attempted to bite a nurse. Under the Written Policy, either concern independently justified using the restraint chair. Although Plaintiff acknowledges the Written Policy later in her response, she cites the wrong section and mischaracterizes its contents. Plaintiff claims that "[e]ven according to HCJC policy, restraints are to be applied only when absolutely necessary, when an inmate is 'uncontrollably violent to their self.'" (Doc. 85 at p. 18.) But the section of the Written Policy Plaintiff cites (§ II(A)) governs restraint devices, generally (*e.g.*, handcuffs, belly belt, leg irons, restraint chair, etc.), and, more

38

specifically, the exception when *lower-ranking deputies* may apply restraint devices *without* the approval of a shift supervisor. (Doc. 68-1 at p. 83.) It states:

> [w]hen restraints are used for other than routine transportation or routine security, such as after an inmate fight or disturbance, the ***shift supervisor must approve their use***. The only exception would be if there is an immediate and urgent need to restrain a person uncontrollably violent to their self, others or property. In this case, ***any deputy may decide when to apply restraints***.

(*Id*.) (emphasis added.) The section of the Written Policy that actually applies (§ VI(A))—and that Plaintiff should have cited—states, "an inmate may be placed in the restraint chair when his/her behavior is so violent to themselves, or others, when unrestrained as to constitute a serious risk to the institution's security and good order." (*Id*. at p. 85.) In short, the evidence clearly demonstrates Sgt. Kilday did not violate any policy.

Third, none of the evidence Plaintiff cites demonstrates that Sgt. Kilday believed Britt was "faking unresponsiveness" or that she decided to use the restraint chair for punitive reasons. Instead, the cited evidence merely suggests that other jail personnel (*e.g.*, Nurse Moore and Officer Andre David) may have perceived that Britt was faking his unresponsiveness. (*See* Doc. 58-1 at p. 16 & Doc. 68-1 at p. 87, respectively.) Sgt. Kilday testified, however, that she had no memory of any jail personnel stating that they thought Britt was faking his symptoms.[7] In fact, during her deposition, Sgt. Kilday

---

[7] *See* Doc. 65 at p. 15. ("Q: who told you that he was faking? A: I don't recall the word faking being said to me that night[.] I don't know if it was said to my officer, but I don't recall it being said to me.")

ardently disputed Officer Andre's recollection of events,[8] and stated that she did not

recall the events Nurse Moore noted in her report.[9] Instead, she testified that:

> the reason why he was put in the restraint chair was not because he was
> faking unresponsive[ness], and abusing an inmate privilege. It was
> because of his threat to do whatever it took to get sent to the hospital . . .
> My concern was to keep him safe. You know, 15 years of experience
> down there, I've watched too many kids do—try too many things to get to
> the hospital . . . [and] if they're a detoxing individual, more than likely
> they may be trying to get there to get pain medication. If they're at that
> hard part of detoxing, which is generally like three to four days into their
> detox, yeah, they would do anything to get there. I've seen them jump off
> of the top tier. I've seen them run themselves into walls, hit their head on
> desks, hit their head on whatever, split their head open, whatever they
> could do to get sent out, so they can possibly get, you know, medication.
> That's, nine out of ten times, what they want when they're detoxing that
> hard. It's hard on their body. I've watched it for 15 years. I've watched
> these kids come in and out.

(Doc. 65 at p. 17-8.) This testimony is further corroborated by the Hamilton County

Sheriff's Office Internal Affairs Memorandum. (Doc. 68-1 at p. 162.) In sum, Plaintiff

fails to raise a genuine dispute of fact on whether Sgt. Kilday thought Britt was "faking

it." There is no evidence that indicates Sgt. Kilday suspected such a thing, nor any

evidence that other individuals' suspicions on the issue influenced Sgt. Kilday's

decisions on October 31.

No reasonable juror could conclude that Sgt. Kilday exhibited deliberate

indifference to Britt's medical needs.

---

[8] *See id.* ("Q: Okay. And do you dispute anything in Officer [] Andre's report? A: Yes. Q. And what is that? A: The statement that [] the reason why he was put in the restraint chair was not because he was faking unresponsive[ness], and abusing an inmate privilege. It was because of his threat to do whatever it took to get sent to the hospital.")

[9] *See id.* ("Q: the precipitating event that Nurse Moore cited was, patient faked unresponsive, then tried falling several times; what she marked . . . is that correct, what this states? A: I don't recall that incident, of his trying to fall.")

### III. *Monell* liability – NaphCare, Inc.

Plaintiff also asserts her § 1983 deliberate indifference claim against NaphCare itself, under theories of *Monell* liability. Deliberate indifference against a municipality "is a stringent standard of fault," which Plaintiff bears the burden of demonstrating. *Shadrick*, 805 F.3d at 737 (*citing Bryan County v. Brown*, 520 U.S. 397, 410 (1997)). When a plaintiff pursues such a claim, "liability attaches only under a narrow set of circumstances." *See Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) ("A municipality may not be held liable under § 1983 on a *respondeat superior* theory—in other words, *solely* because it employs a tortfeasor."). Plaintiff must first show that the "municipality had a 'policy or custom' that caused the violation of their rights." *Id.* at 828 (citations omitted). There are four methods of doing so: "plaintiff may prove (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Id.* (citations omitted). Plaintiff must then show that, "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Id.* Moreover, just like a deliberate indifference claim against an individual defendant, the standard for *Monell* liability is comprised of both an objective and subjective component. *Shadrick*, 805 F.3d at 737. The objective component requires a "sufficiently serious medical need." *Id.* The subjective component requires proof that defendants possessed a culpable state of mind that is "routinely equated . . . with recklessness." *Id.* (*citing Farmer*, 511 U.S. at 836).

Although not abundantly clear which (or how many) method(s) of liability Plaintiff is pursuing, she contends that NaphCare maintained a "policy of deficient medical evaluation process of inmates and grossly inadequate training." (Doc. 86 at p. 35-36.) Each theory is discussed below.

### A. Affirmative Policy – Deficient Medical Evaluation

Plaintiff first argues that NaphCare maintained a policy of deficient medical evaluation process for inmates. This type of municipal liability is often referred to as an "affirmative policy or custom theory." *North*, 754 F. App'x at 386. In addition to demonstrating a constitutional violation, "a plaintiff pursuing an affirmative policy or custom claim against a municipal entity must (1) show the existence of a policy, (2) connect that policy to the municipality, and (3) demonstrate that his injury was caused by the execution of that policy." *Id.* at 390-91. Plaintiff must also show that the stated policy or custom was the "moving force of the constitutional violation." *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1994).

NaphCare argues that summary judgment is warranted since there is no evidence its customs, practices, or policies were a "driving force" in any harm to Britt. NaphCare states that its medical evaluation process: "(1) medically assess[ed] Britt during booking at the jail; (2) plac[ed] him on drug withdrawal protocol, including appropriate medications for an individual experiencing heroin withdrawal; (3) ensur[ed] that Britt was monitored and assessed by medical personnel every day during his incarceration . . .; and (4) immediately respond[ed] to medical calls and render[ed] care to Britt, including sending him to the hospital." (Doc. 78.)

42

In response, Plaintiff argues that she has "submitted sufficient evidence for a jury to find that NaphCare's policies, practice and customs directly [led] to Tommy Britt's suffering at the jail, suffering in the restraint chair, and suffering in a cell for two days with no medical care." (Doc. 86 at p. 35-36.) For this contention, she relies on the report of her corrections healthcare expert, Dr. Mendel. First, Plaintiff states the "intake nurse did not ask Tommy the right questions about his substance abuse history." (*Id.*) Second, Plaintiff states the "nurse medical evaluation did include an evaluation for cardiac murmur, did not check for infection, did not asks questions to determine the case if his increased heart rate, and was not referred to a physician for further evaluation[.]" (*Id.*) (in original.) She then states that, "Dr. Mendel concluded that the medical evaluation process developed by NaphCare fell below the applicable standards of care." (*Id.*)

For the following reasons, Plaintiff's assertions regarding the deficiencies of NaphCare's medical evaluation process fail to support a claim under *Monell*.

First, Plaintiff has not demonstrated that Britt's constitutional rights were, in fact, ever violated. *See North*, 754 Fed. Appx. at 389 ("There must be a constitutional violation for a § 1983 claim against a municipality to succeed."). As discussed above, none of the individual NaphCare employees violated Britt's constitutional rights. And while the Sixth Circuit has left open the possibility that a municipality could still be found liable even in the absence of a violation by one of its employees, *see Winkler*, 893 F.3d at 899-903, Plaintiff must still "show that the municipality itself, through its acts, policies, or customs, violated [Britt's constitutional] rights by manifesting deliberate

indifference to his serious medical needs." *North*, 754 Fed.Appx at 391.  Plaintiff has not done so.

Second, Plaintiff fails to demonstrate how NaphCare's medical evaluation policy was in any way the "driving force" behind Britt's injury.  Instead, Plaintiff merely points out things that NaphCare could have done differently.  But "in virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Troutman*, 979 F.3d at 490 (citation omitted).

Plaintiff asserts that NaphCare's medical staff "did not check for infections, did not asks questions to determine the [cause of] his increased heart rate," did not identify that his "increase in temperature could be indicative of an infection," and failed to refer him "to a physician for further evaluation."  (Doc. 86 at p. 36.)  But given the fact that an increased heart rate and temperature are symptoms synonymous with heroin withdrawal, these "apparent problems . . . seem to consist of 'one or two missteps' rather than the kind of widespread, gross deficiencies that would support a finding of deliberate indifference." *North*, 754 Fed. Appx at 392 (citations omitted).  Furthermore, Plaintiff states that, based on these identified failures, "Dr. Mendel concluded that the medical evaluation process developed by NaphCare fell below the applicable standards of care."  (Doc. 86 at p. 36.)  Even if NaphCare's policy fell below the applicable standard of care, the Sixth Circuit has affirmatively held that "deliberate indifference remains distinct from negligence.  Where a city does create reasonable policies, but negligently administers them, there is no deliberate indifference and therefore no § 1983

44

liability." *Troutman*, 979 F.3d at 490 (citations omitted). In short, Plaintiff identifies improvements that could be made to NaphCare's intake process, which could indicate a degree of negligence. But as discussed, this does not prove deliberate indifference. Moreover, Plaintiff fails to reconcile the fact that Britt's death was the direct result of his daily, seven-year long intravenous drug use, all of which occurred prior to his eight-day long detention. Although the severity of his symptoms from October 29-November 1 are in dispute, it is obvious that Britt's most aberrant symptoms did not appear until November 2, the same day NaphCare staff escalated his care to the hospital. He then remained in the hospital for twenty days before tragically passing away. There is no evidence that the superior intake process endorsed by Plaintiff's expert would have ultimately saved Britt's life or otherwise was the driving force behind his death.

Third, Plaintiff fails to show how NaphCare's actions were taken with the requisite degree of culpability. Plaintiff concedes that NaphCare has a medical evaluation policy in place. And it is undisputed that, pursuant to that policy, medical staff assessed Britt during intake, identified his withdrawal symptoms, and placed him on withdrawal protocols. Medical staff then monitored and assessed Britt every day he was in withdrawal protocol and prescribed him medications to treat his symptoms. Both times Britt experienced complications, medical staff responded immediately. On October 31, the NaphCare Nurses rushed to Britt's cell, assessed his condition, and determined that he was stable. On November 2, medical staff quickly responded and decided to send him to the hospital. While NaphCare's system may not be perfect, Britt was provided treatment for his withdrawal symptoms and, when complications arose,

45

NaphCare staff immediately responded and assessed the situation. Although Plaintiff now questions the adequacy of those assessments and argues that NaphCare should have responded differently, "courts are generally reluctant to second guess the medical judgment of prison officials." *Winkler*, 893 F.3d at 892 (citations omitted); *see also, e.g., Troutman*, 979 F.3d at 490 (citations omitted).

In sum, Plaintiff has not demonstrated systematic deficiencies that would rise to the level of deliberate indifference. *See North*, 754 Fed.Appx. at 392. Plaintiff's affirmative policy or custom theory thus fails.

Relatedly, it appears Plaintiff briefly contends NaphCare should be liable for either failing to follow its own policies, or because it had a policy or custom of inaction. To succeed under either theory—that a municipality had a policy or custom of "inaction," or that there was a custom or practice of not following the municipalities own established policies—Plaintiff "would have to present proof of a persistent pattern of unconstitutional conduct, and that [NaphCare] had constructive notice of that pattern." *Winkler*, 893 F.3d at 902.[10] Plaintiff fails to do so. She does not address how or if NaphCare had been put on notice of the alleged unconstitutional conduct, constructive or otherwise. And there is no record of NaphCare providing constitutionally inadequate medical care to inmates in the past. Since Plaintiff only

_____

[10] The full test for such an argument is that Plaintiff must show, "(1) 'a clear and persistent' pattern of unconstitutional conduct by [NaphCare] employees; (2) the municipality's 'notice or constructive notice' of the unconstitutional conduct; (3) the municipality's 'tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction'; and (4) that the policy of inaction was the 'moving force' of the constitutional deprivation . . ." *Winkler*, 893 F.3d at 902 (*citing D'Ambrosio v. Marino*, 747 F.3d 378, 387–88 (6th Cir. 2014)).

discusses Britt's treatment, she "therefore cannot establish that [NaphCare] had a custom of deliberate indifference to the serious healthcare needs of all the inmates incarcerated at the [HCJC]." *Id.* (*citing Gregory v. City of Louisville*, 443 F.3d 725, 763 (6th Cir. 2006) ("[A] plaintiff 'cannot rely solely on a single instance' to prove the existence of an unconstitutional custom.")).

### B. Failure to Train

Plaintiff also argues that NaphCare had a policy of "grossly inadequate training." (Doc. 86 at p. 35.) To succeed on an inadequate training claim, Plaintiff "must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Winkler*, 893 F.3d at 902 (citation omitted). Plaintiff cannot satisfy any of these three steps.

***Adequacy of Training.*** At the outset, Plaintiff has not definitively demonstrated how NaphCare's training or supervision was, in fact, inadequate. Again, Plaintiff relies on a brief summation of Dr. Mendel's report, and specifically his conclusion that NaphCare did not adequately train its staff. However, the Sixth Circuit has held that the "opinion of [Plaintiff]'s medical expert that [defendant]'s training program was inadequate is not, by itself, sufficient to show deliberate indifference. . ." *Winkler*, 898 F. 3d at 904.

Irrespective of the fact that Plaintiff's theory fails for this reason alone, Plaintiff's argument is also inadequate as a matter of law. The Sixth Circuit has held that a

47

plaintiff cannot meet her burden of proof of demonstrating an inadequate training program by showing: (1) "that one staff member was unsatisfactorily trained," (2) that "an otherwise sound training program was negligently administered," or (3) that "harm could have been avoided if the nurse had had 'better or more training, sufficient to equip [her] to avoid the particular injury-causing conduct.'" *Shadrick*, 805 F.3d at 738 (*citing City of Canton, Ohio v. Harris*, 489 U.S. 378, 390-91 (1989). Yet Plaintiff's argument is premised exclusively on evidence falling within these three categories.

First, Plaintiff asserts that "NaphCare training deviated from his policy that stated an increase in temperature could be indicative of infection and that a normal temperature was 100.4." (Doc. 86 at p. 35-36) (in original.) Second, Plaintiff states that "the nurses were improperly trained by NaphCare that an abnormal heart rate was 'anything above 110.' This is contrary to NaphCare policy that a normal pulse rate is 60-100 beats per minute and an increase in pulse could be indicative of infection. The failure to properly train would prevent nurses from recognizing a serious medical need and deprive a detainee of appropriate access to medical care." (*Id.*) Third, Plaintiff states that the "significant number of deficient responses and the deviation from accepted medical interpretation of vital signs indicates grossly inadequate training by NaphCare." (*Id.*) The evidence on record, however, shows that the only time a NaphCare employee may have deviated from any policy was when Nurse McFarland determined that Britt's increased temperature (100.9) and pulse (103 and 107) were "within normal limits." And the Supreme Court has held "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for

the officer's shortcomings may have resulted from factors other than a faulty training program." *Harris*, 489 U.S. at 390-91. Moreover, it is inconclusive whether Nurse McFarland ever even deviated from any policy since the evidence also shows that nurses were trained to elevate an inmate's medical needs based on numerous factors, not just one or two symptoms. Furthermore, Nurse McFarland conclusively testified that she did not feel Mr. Britt's temperature or pulse were abnormal under the circumstances of a detoxing patient. Under similar circumstances, the Sixth Circuit has held that " even if we could infer from Nurse [McFarland]'s alleged failure to follow [NaphCare]'s internal protocols when treating [Britt] that she was inadequately trained, this alone cannot establish deliberate indifference on the part of [NaphCare]." *Winkler*, 893 F.3d at 904.

      ***Result of NaphCare's Deliberate Indifference.*** Plaintiff also fails to show how any such inadequacy "was the result of [NaphCare]'s deliberate indifference." *Winkler*, 893 F.3d at 902. Under Sixth Circuit precedent, Plaintiff can prove this in one of two ways. *Shadrick*, 805 F.3d at 738-39. First, Plaintiff could show "a pattern of similar constitutional violations by untrained employees" that demonstrates NaphCare was "clearly on notice that the training in this particular area was deficient and likely to cause injury." *Id.*; *see also Griffith*, 975 F.3d at 583. This mode of proof is unavailable here since Plaintiff only discusses Britt's alleged constitutional violation and has not provided evidence of any other instances of HCJC inmates receiving constitutionally inadequate healthcare. Therefore, Plaintiff must pursue the second mode of proof, which requires that she establish "a single violation of federal rights, accompanied by a

showing that [NaphCare] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Id.* at 739 (*citing Bryan Cnty.*, 520 U.S. at 409). This mode of proof is only available "in a narrow range of circumstances where a federal rights violation may be a highly predictable consequence of a failure to equip employees with specific tools to handle recurring situations." *Id.* (citation omitted). Although Plaintiff does not specifically argue that she could satisfy this mode of proof, NaphCare contends that, even if she had, she would fail as a matter of fact and law. The Court agrees.

The leading Sixth Circuit case on point, which both parties cite, is *Shadrick*, 805 F.3d at 739-744. There, the Sixth Circuit reversed the district court's grant of summary judgment in favor of a private medical contractor and held that a reasonable juror could find that the training program and supervision on record were deliberately indifferent. *Id.* The inmate, who developed a severe infection, repeatedly requested treatment but nurses never gave him medication, never reported the infection to the jail's medical director, and never sought emergency hospital care. *Id.* at 729-31. The Sixth Circuit found that (1) there was "no indication" that defendants "designed and implemented any type of ongoing training program for its LPN nurses; " (2) nurses' "superiors did not give feedback or regular evaluations to let them know whether they performed appropriately;" (3) there was a "blanket inability of the [] nurses [] to identify and discuss the requirements of [the] written policies governing their work;" (4) there was open acknowledgement that nurses "followed an undocumented policy and custom of providing medical assistance only if an inmate asked for it, despite the existence of

written policies, procedures, and treatment protocols mandating that nurses take particular actions at particular times," and (5) plaintiff "traced the lack of adequate training and supervision to the top of [the] organization," which included the on-site nursing manager who admitted that "she was not familiar with the [] policies she was specifically designated to enforce," and the President who was "not college-educated or medically trained, and [] could not explain the differences in the permitted scope of medical practice for LPNs and RNs." *Id*. at 740-41.

None of these factors are present here. It is undisputed that NaphCare had a training program in place, and that that training program led to Britt receiving medical care for his heroin withdrawal. It is also undisputed that NaphCare had a post incident review process. (Doc. 87 at p. 14.) It is further undisputed that NaphCare had a well-developed chain of command, "beginning with LPNs, then RNs, then Charge Nurse/Nursing Director and ending with the Medical Director, Dr. Everson, and Health Services Administrator Maria Klug/Perdikakis." (*Id*.) In addition, NaphCare also employed nurse practitioners, like Michael Pegram. In this regard, the Sixth Circuit has previously held that, "[a]lthough some of the factors relevant in *Shadrick* are present here, there are also some important differences. In addition to LPNs, the jail employed nurses and medical providers with more advanced training and certifications (*e.g.*, registered nurses (RNs), nurse practitioners (NPs), and physicians) to treat inmates." *North*, 754 Fed.Appx at 393. Moreover, Plaintiff has not identified a "blanket inability" of employees' failure to identify or discuss NaphCare's policies. *Shadrick*, 805 F.3d at 740. Nor has she identified an admitted custom of nurses disregarding those

51

polices. *Id*. And she has not traced the lack of adequate training and supervision to the top of NaphCare's organization. *Id*. at 741. Lastly, Plaintiff "does not identify what other medical training she believes that the jail personnel should have received," *Winkler*, 893 F.3d at 903; *see also, e.g., Griffith*, 975 F.3d at 584 (same), and has not demonstrated how NaphCare "failed to train its employees to handle a recurring situation" or how such a recurring situation "presented an obvious potential for the constitutional violation at issue." *Griffith*, 975 F.3d at 584.

> **Causation.** Finally, even if Plaintiff had identified a training inadequacy and could prove that it was the result of NaphCare's deliberate indifference, Plaintiff still cannot demonstrate how any such inadequacy was "closely related to or actually caused [Britt]'s injury." *Id*. at 585 (*citing Jackson*, 925 F.3d at 834). This case is analogous to the Sixth Circuit's decision in *Griffith*, where the court held that:

> At its core, [plaintiff's] claim is that jailers should have been better trained as to when they needed to alert medical professionals about a particular inmate's deteriorating condition. However, Griffith saw medical staff multiple times per day during his time in detox, and the Deputy Jailers testified that this is the standard practice during detox. Because nothing in the record suggests that the deputy jailers would have done anything other than report to Nurses Trivette and Sherrow, both of whom evaluated Griffith multiple times during his detox period, he cannot demonstrate causation.

*Id*. Similarly, here, NaphCare staff assessed that Britt was suffering from withdrawal symptoms, which they treated. Plaintiff argues that NaphCare staff should have been better trained to alert their superiors about Britt's deteriorating condition, but it is undisputed that Britt's elevated pulse and temperature are symptoms synonymous with heroin withdrawal. When Britt's condition deteriorated the first time, the

NaphCare Nurses assessed him and determined he was stable. When his condition deteriorated a second time, NaphCare personnel sent him to the hospital. And regardless, "[m]ere allegations that [jail personnel were] improperly trained or that an injury could have been avoided with better training are insufficient to prove liability." *Miller v. Calhoun County*, 408 F.3d 803, 816 (6th Cir. 2005).

In sum, NaphCare's "training program is not so inadequate that failing to provide additional training constitutes deliberate indifference to an obvious risk of injury." *North*, 754 Fed. Appx. at 393-94.

### Counts II-IV: Remaining State Law Claims

Plaintiff also asserts three state law claims against various Defendants. However, Plaintiff's § 1983 claims served as her sole basis for federal jurisdiction. And the Court, having found no constitutional violations, has already granted summary judgment on all § 1983 claims in favor of all remaining defendants. When presented with this scenario, the Sixth Circuit has repeatedly held that "a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims." *Rouster*, 749 F.3d at 454 (citations omitted); *see also Winkler*, 893 F.3d at 905. "This rule accords with principles of federalism: 'Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.'" *Rouster*, 749 F.3d at 454 (*quoting United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well.").

Moreover, Plaintiff's state law claims implicate complex questions regarding the relevant standard of care, as well as the applicability of the "loss of chance" doctrine in proving causation.  The parties have differing interpretations, for example, of *Roberts v. Ohio Permanente Med. Group, Inc.*, 76 Ohio St.3d 483, 485 (1996), and argue about the reasoning and purpose behind the Ohio Supreme Court's decision.  The Court declines to resolve these novel questions of Ohio law that are best adjudicated by Ohio courts.  Accordingly, pursuant to 28 U.S.C. § 1367, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.

## CONCLUSION

For the reasons above, the Court rules as follows:

(1)     As to **Count I**, NaphCare Defendants' motion for summary judgment (Doc. 78) is **GRANTED**; NaphCare, Inc., Angela Moore, Danielle McFarland, and Allison Kolb are all entitled to judgment in their favor on Plaintiff's § 1983 claims for deliberate indifference;

(2)     Also as to **Count I**, County Defendants' motion for summary judgment (Doc. 79) is **GRANTED**; Sgt. Kilday is entitled to judgment in her favor on Plaintiff's § 1983 claim for deliberated indifference;

(3)     **Counts II-IV** are **DISMISSED WITHOUT PREJUDICE**; and

(4)     This case is hereby **CLOSED** on the docket of this Court.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND